# CHRYSLER CORPORATION v. TROTT.*
### Patent Appeals No. 3581.

Court of Customs and Patent Appeals.
May 4, 1936.

GRAHAM, P. J., and LENROOT, J., dissenting.

*Appellee's petition for rehearing denied June 17, 1936.

J. King Harness, of Detroit, Mich., and Charles M. Thomas and Francis D. Thomas, both of Washington, D. C. (Melville Church, of Washington, D. C., of counsel), for appellant.

Vernon E. Hodges, of Washington, D. C. (Harris Hamlin Hodges, of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Commissioner of Patents affirming the decision of the Examiner of Trade-Mark Interferences dismissing the notice of opposition of Rolland S. Trott, and holding that appellant was not entitled to the registration of the words "Floating Power" as a trade-mark, for use on engine mountings, on the ground that the alleged trademark was merely descriptive of the goods on which it was used.

In its application, appellant alleged that it had continuously used its trade-mark on engine mountings since June 3, 1931.

In his notice of opposition, opposer alleged that he had used the notation "Floating Engine" as a trade-mark "in connection with both the installation and sale" of engine mountings, long prior to June 3, 1931, the date of alleged first use by applicant of its trade-mark; that his engine mountings were so designated and known during that period of time; that the goods of the parties possess the same descriptive properties; that, prior to its first use of its trade-mark, applicant was aware of opposer's use of the notation "Floating Engine" on opposer's engine mountings; that opposer has continuously used the notation "Floating Engine * * * as a trademark since a date prior to the alleged use of applicant's trade-mark, which is June 3, 1931"; that the marks are confusingly similar; that their concurrent use by the parties would be likely to cause confusion of origin and ownership of the goods to which they were applied; and that opposer would be damaged by the registration to appellant of its trade-mark. (Italics ours.)

Opposer further alleged in his notice of opposition that "attached to this petition are photographs showing how opposer's trade-mark 'Floating Engine' has been, and is, used on automotive engine mountings."

In its answer to the notice of opposition, appellant stated that, to its knowledge, opposer had never used the trademark "Floating Engine" on engine mountings. Appellant denied that the photographs attached to the notice of opposition actually disclosed any use by the opposer of the term "Floating Engine" as a trademark on engine mountings, prior to appellant's first use of its trade-mark, and alleged that the opposer would not be damaged by the registration of appellant's mark.

The record discloses but one photograph, dated March 31, 1932, attached to opposer's notice of opposition.

It appears from the testimony of the opposer, Rolland S. Trott, that the notation "Floating Engine" had never been applied to his engine mountings, or parts thereof, prior to March 31, 1932, although he had used the term in connection with such mountings in "conversation, in promotion of the business, [and] in sale arguments and talks" prior to 1929, "and in letters written to * * * automobile concerns" as early as some time in the summer of 1929.

In his decision, the Examiner of Trade-Mark Interferences stated that the notice of opposition raised only the question of the confusing similarity of the marks; that it was clear from the record that the opposer had not used its alleged trademark "Floating Engine" as such prior to the first use by appellant of its trademark; that, therefore, the opposer was not in a position to oppose the registration, and, accordingly, dismissed the notice of opposition.

However, the Examiner considered the application ex parte, and held that the words "Floating Power," when used on engine mountings, were merely descriptive of the character or quality of the goods on which they were used; that appellant was not entitled to the exclusive use of its al-

leged trade-mark; and that, therefore, it was not entitled to register the same under the provisions of the Trade-Mark Act of February 20, 1905, as amended (15 U. S.C.A. § 81 et seq.).

Appellant appealed from the decision of the Examiner of Trade-Mark Interferences to the Commissioner of Patents.

The opposer did not appeal.

When the cause was submitted to the Commissioner of Patents, appellant questioned the right of the opposer and his counsel to appear and be heard on the issues presented by appellant's appeal, and further moved to "strike the brief" of counsel for the opposer.

Although conceding the proceeding to be ex parte, the commissioner, nevertheless, held that, due to the fact that counsel for appellant had made certain stipulations with counsel for the opposer relative to the filing of briefs and the postponement of the hearing, and the fact that certain charges of fraud were made in the brief of counsel for appellant, he would receive and consider the brief of counsel for the opposer, regardless of the *right of the opposer to appear as a party to the proceeding*. In other words, as we understand it, the commissioner permitted counsel for the opposer to file a brief and argue the cause as amicus curiæ.

The next question presented to the commissioner was stated by him as follows:

"* * * Is the opposer so guilty of fraud and misrepresentation in filing his opposition as to vitiate the proceeding entirely and render it void ab initio [as claimed by counsel for appellant]? Careful consideration has been given to this question with the result that it is concluded, notwithstanding the strong language employed by the applicant in referring to the opposer, that nothing appears in the record which justifies the view that the opposer was either deceitful or fraudulent in filing the opposition. Indeed, it seems that the opposer is guilty only of a variance, of a difference between pleading and proof. * * *"

The commissioner concluded that the opposition proceeding was not void ab initio, and that he had jurisdiction to decide the case on its merits.

In his decision, holding that the mark was merely descriptive of the goods on which it was used, the commissioner stated that prior to the first use by appellant of the notation "Floating Power" as a trade-mark on engine mountings—

"* * * it was common practice to refer to the engine as a floating one [in issued patents where mountings of the type used by appellant were involved]. For example, United States Letters Patent No. 1,701,396, applied for nearly five years before the applicant's alleged date of first use and granted more than two years before, refers to 'floating the engine', to a 'floated mass', to the 'engine floating elements', and to the 'engine being floated'. Patent No. 1,729,394, both applied for and granted long before applicant's first use, speaks of a 'floating engine', the 'floating body', etc., in describing a resilient engine mounting. Also, Patent No. 1,761,584, applied for and granted before the applicant's use of the notation, repeatedly refers to the action as being a 'floating action', the mount as being a 'floating mount', the engine as being a 'floating engine'.

"It seems obvious, *if a power unit or source of power* is mounted in resilient mountings of this character, and *referred to as 'floating power'*, the *term is merely descriptive of the assemblage*. The term 'floating' when so applied is clearly and, as indicated by the patents or records, obviously descriptive. The addition thereto of the term 'power' does not save the notation and render it non-descriptive. *'Power' in this sense is the equivalent of 'engine' and the compound term 'floating power' would accordingly seem to indicate nothing more than a floating power unit.* To concede that the applicant is entitled to the exclusive use of the words 'floating power' in *describing a unit resiliently mounted* would be to deprive other manufacturers of their natural right to the free and unrestrained use of descriptive terms, more specifically of their right to *refer to such a unit as a 'floating power unit'*." (Italics ours.)

It clearly appears from the record that the opposer used the notation "Floating Engine" in conversation and in correspondence, including correspondence with appellant, prior to the first use by appellant of its mark, in an effort to interest appellant and others in his invention relating to engine mountings, and that the patents cited by the commissioner in his decision refer to "a floating engine," "floating the

engine," and "engine-floating elastic elements."

Although the commissioner stated in his decision that in patent No. 1,729,394, issued September 24, 1929, to R. K. Lee, the patentee described his resilient engine mountings by the terms "floating engine" and "floating body," we are unable to find that those terms were used to *describe* the patentee's resilient *engine mountings*. The commissioner also stated in his decision that the patentee R. H. Prosser, in patent No. 1,761,584, relating to resilient engine mountings, issued June 3, 1930, repeatedly referred to "the action as being a 'floating action,'" and to the "mount as being a 'floating mount.'" We have carefully examined that patent, and are unable to find any reference therein to "the action as being a 'floating action,'" or to the "mount as being a 'floating mount.'"

It appears from the testimony of the opposer that he never referred to his invention as "floating motor," and that he made no distinction between the terms "floating engine," "floating motor," and "floating power." We quote from his testimony:

"Q. 20. Then do you interpret 'power' to mean engine, motor, or is it some intangible thing in your opinion as used with 'floating' in the notation 'floating power.' * * * A. It is a shortening of 'power plant.' For years practically all of the automobile industry advertised 'unit power plant' when they first began to attach the transmission to the engine to form a unit."

Opposer further stated that he demonstrated his invention to appellant prior to appellant's first use of its alleged trademark "Floating Power"; that, in April, 1930, he entered into an agreement with the Borg-Warner Corporation, whereby that corporation was empowered to manufacture opposer's engine mountings and to enter into contracts for their use by others. We quote from his testimony:

"X-Q. 117. And is that licensing arrangement an exclusive one so that the Borg-Warner Corporation is the only one entitled to manufacture engines as you call floating engines? * * * A. I am not sure whether it states that it is exclusive or that I will sign no other license. * * *

"X-Q. 118. At any rate its provisions are such, are they not, that no one else, including yourself, has the right or the authority to make and sell this so-called floating engine of yours? * * * A. I am not sure whether I could myself or not; I would have to read it over first.

"X-Q. 119. All of your efforts to commercialize these inventions are through the Borg-Warner Corporation, and have been since the date of that license agreement? A. Yes.

"X-Q. 120. Have you actually made and sold any of these constructions? A. I haven't; no. I am not employed by Borg-Warner.

"X-Q. 121. Is it not true that the Borg-Warner Corporation selected the name 'Vibranon' as the name for your type of construction after they had taken this license from you? A. I believe that is the name which was mentioned in the proposed tentative Chrysler-Borg-Warner contract.

"X-Q. 122. Have they ever adopted any other name for these constructions? A. I have never seen even that name stamped on any of the mountings.

"X-Q. 123. What was the purpose of stamping any name on the mountings by either you or the Borg-Warner Corporation? A. To establish our right to use it beyond what we had already established by my verbal use and my use in letters.

"X-Q. 124. When was the first time that the name 'floating engine' was ever applied to any of these by either you or the Borg-Warner Corporation? A. I don't recollect the date but it is on the photograph.

"X-Q. 125. Was it before or after the adoption of the name 'floating power' by the Chrysler Corporation? A. What do you mean by "adoption"?

"X-Q. 126. I will ask it this way: Was it before or after 1931? A. I believe it was after 1931, but it might have been in 1931. That photograph shows it in any case.

"X-Q. 127. I would like for you to be as concrete as possible as to when that was first done. Is there any way you can tell whether or not it was after 1931? A. Yes, look at that photograph and you will see.

"X-Q. 128. Which photograph do you refer to now? A. The photograph showing the floating engine stamped with 'floating engine,' filed with the opposition.

"X-Q. 129. · I show you a photograph with the date March 31, 1932, thereon; is that it? A. That's it.

"X-Q. 130. That is the first time that the name 'floating engine' was applied by you or the Borg-Warner corporation to any engine or mounting parts? A. Physically, yes.

"X-Q. 131. When did you first refer to your engine as a 'floating engine'? A. I can't be sure exactly, it was in 1925 or 1926, but I believe I first wrote of it as a 'floating engine' in the summer of 1929.

"X-Q. 132. And any use which you made of that name prior to 1932 was merely in conversations and in writing letters about your engine? A. Well, I will say in the prosecution of my business the same as Chrysler used 'floating power' in the prosecution of his business.

"X-Q. 133. Just what do you mean by that? A. I mean that I did not stamp—

"X-Q. 134. Let's ask the question this way: Describe all the ways you used the name 'floating engine' prior to 1932. A. Conversation, in promotion of the business, in selling arguments and talks, and in letters written to and received from automobile concerns."

It is clear from the testimony of the opposer, hereinbefore quoted, that neither he nor the Borg-Warner Corporation, licensee, had ever physically applied the notation "Floating Engine" to engine mountings prior to March 31, 1932, and that it was then so applied, as stated by the witness, "To establish our right to use it beyond what we had already established by my verbal use and my use in letters."

Just what interest or rights the opposer had in his patents, or the trade-marks and trade-names to be used thereon, is not clear from opposer's own testimony. He stated, as hereinbefore noted, that he was not certain of his rights under his so-called "licensing arrangement" with the Borg-Warner Corporation, and did not know whether he had the right to manufacture or sell his engine mountings under the notation "Floating Engine"; that, subsequent to April, 1930, all of his efforts to commercialize his inventions were made through the Borg-Warner Corporation; that he was not employed by that concern; and that he had never constructed or sold any of his patented engine mountings.

It is contended by counsel for appellant that the material allegations contained in the notice of opposition were fraudulently made by the opposer; that it clearly appears from the testimony of the opposer that he had not used the notation "Floating Engine" on engine mountings prior to the alleged and established date of appellant's use of the trade-mark "Floating Power"; that, although opposer alleged in his notice of opposition that the photograph, dated March 31, 1932, which was attached thereto, showed how he had been, and was at that time, using his trade-mark "Floating Engine" on engine mountings, it appears from the opposer's testimony that neither he nor the Borg-Warner Corporation had ever applied the term "Floating Engine" to engine mountings prior to the time the photograph was taken, which was the date the notice of opposition was signed and verified; that opposer was a patent attorney at the time he filed his notice of opposition, and, therefore, was not only in a position to know, but that he did know that the statements contained in his notice of opposition were false; that he cannot be excused on the ground that there was a mere variance between the allegations contained in the notice of opposition and his testimony relative to the facts, as held by the Commissioner of Patents; that opposer's notice of opposition was false, fraudulent, and deceptive; that it was "void ab initio and incapable of setting the judicial machinery of the appellate tribunals of the Patent Office in motion"; and that those tribunals were, and this court is, without jurisdiction to "review and decide ex parte issues which might be considered in a *lawfully instituted proceeding*."

It may be said at this point that counsel for opposer alleged in his brief that the opposer "is not a lawyer and never pretended to be. He is a college-trained (Cornell graduate) mechanical engineer of rare originality, skill and ingenuity." However, in his testimony, the opposer stated that he had been an inventor for about twenty-seven years, and that he was a "patent attorney."

[1] We have examined the record with the care which the charge of fraud necessarily requires. It appears that the opposer's testimony flatly contradicts the allegations contained in his notice of opposition that he had used the notation "Floating Engine" as a trade-mark on engine mountings prior to June 3, 1931, and that the photograph attached to the notice of opposition showed how his trade-mark *had*

*been* used by him. It further appears that the photograph, above referred to, was taken on March 31, 1932, the date the notice of opposition was signed and verified by opposer, and that neither the opposer nor the Borg-Warner Corporation, licensee, had ever applied the notation "Floating Engine" to engine mountings, either as a trade-mark or otherwise, prior to March 31, 1932. Nevertheless, there is nothing of record to substantiate the charge that the opposer acted with any fraudulent intent, or that his conduct was "willful" or "morally reprehensible." See 21 C.J. pp. 180 to 184, §§ 163 to 166, inclusive. The opposer frankly disclosed the facts in his testimony, including the use of the notation "Floating Engine" *in connection with* his efforts to secure the use by manufacturers of his patented engine mountings, and, although he was cross-examined at considerable length by counsel for appellant, he was never asked to explain the reasons for, nor does the record contain any explanation of, the misstatements of fact contained in his notice of opposition. We are of opinion that, although there was a material variance between the material averments of the notice of opposition and the evidence introduced by the opposer, the tribunals of the Patent Office had jurisdiction in the case at bar to dispose of any question that might properly be presented in an ex parte case, including the question of the descriptiveness of appellant's mark. See California Cyanide Co. v. American Cyanamid Co., 40 F.(2d) 1003, 17 C.C.P.A.(Patents) 1198; Bookman v. Oakland Chemical Co., 40 F.(2d) 1006, 17 C.C.P.A.(Patents) 1213; Skookum Packers' Asso. v. Pacific Northwest Canning Co., 45 F.(2d) 912, 18 C.C.P.A.(Patents) 792; Establissements Rene Beziers, etc. v. Reid, Murdoch & Co., 48 F.(2d) 946, 18 C.C.P.A.(Patents) 1340; George H. Ruth Candy Co. v. Curtiss Candy Co., 49 F.(2d) 1033, 18 C.C.P.A.(Patents) 1471; California Canneries Co. v. Lush'us Products Co., 49 F.(2d) 1044, 18 C.C.P.A.(Patents) 1480. We do not mean to be understood as holding that, in view of the statute, our conclusion would have been different had the opposer been guilty of the offense charged by counsel for appellant.

In their brief, counsel for appellant stated that as the opposer had not appealed from the decision of the Examiner of Trade-Mark Interferences dismissing his notice of opposition, he was not a proper party to this appeal, and that if a brief were filed on his behalf, a "motion to strike * * * [would] be presented." At the time of the oral arguments in this court, counsel for appellant stated that a motion for that purpose would be filed. Thereafter, on January 18, 1936, such a motion was filed by counsel for appellant. It was not limited, however, to the reasons assigned in their brief, but contained two additional reasons, namely: First, that the brief of counsel for opposer contained statements and arguments relative to alleged facts not appearing of record, and, second, that it contained "baseless, but malicious, vituperative and scandalous accusations leveled at appellant and his counsel."

In his brief, counsel for opposer, contrary to well-established rules of practice, repeatedly and vigorously attacked the character of appellant, largely, if not entirely, regarding alleged misconduct relating to matters not appearing of record nor germane to the issues involved. See 3 C.J. pp. 1432, 1433, § 1595. (The charges so made by counsel for opposer were probably occasioned by the charge of fraudulent conduct on the part of opposer by counsel for appellant, hereinbefore discussed and determined.) Furthermore, counsel for opposer has made statements in his brief regarding alleged facts not appearing of record, and of which this court has no authority to take judicial notice.

In view of the fact that the opposer did not appeal from the decision of the Examiner of Trade-Mark Interferences dismissing his notice of opposition, and as the proceeding relative to the question of the descriptiveness of appellant's mark before the tribunals of the Patent Office was ex parte, the opposer is not a proper party to this appeal.

The issues before us concern only appellant on the one hand, and the Patent Office tribunals, representing the public, on the other. Obviously then, counsel for opposer had no authority to appear in this court and file a brief on behalf of the opposer, and, without leave of the court, had no right to appear at all. Accordingly, the brief of counsel for opposer might well be stricken from the files of this court. However, due to the facts hereinafter stated, we are not disposed to follow that course.

Counsel for opposer was permitted to appear before the tribunals of the Patent Office, apparently as amicus curiæ, and had filed his brief and participated in the oral arguments in this court, prior to the filing of appellant's motion. The vital issue in the case—the question of the descriptiveness of appellant's mark—has been well presented by opposer's counsel. We shall, therefore, accept his brief with the understanding that the use of the abusive statements contained therein relative to the character of appellant, which statements are neither supported by the record nor germane to the issues in the case, deserves and receives the disapprobation of this court, and with the further understanding that all such statements, and others regarding alleged facts not found in the record have been, and will be, disregarded in our consideration and determination of the involved issues. Accordingly, appellant's motion to strike the brief of counsel for the opposer is denied.

The next question requiring our consideration is whether appellant's mark "Floating Power" is merely descriptive of the goods on which it is used, or of the character or quality of such goods, as held by the tribunals of the Patent Office.

It should be observed at the outset, although it is a matter of no great importance, that appellant's mark is not used on "engines," "power units," "power plants," or "unit power plants," as held in substance by the commissioner, but is used only on "vehicle engine mountings." It is clear from the record, although there is some testimony to the contrary, that such mountings are not integral parts of the "engine," "frame," or "power plant" of an automobile, but are separate and independent commercial entities and serve merely to resiliently connect or attach the "power plant" to the frame.

In opposer's patent No. 1,834,907, issued December 1, 1931, relating to engine mountings, the patentee stated that the rubber mountings "carry the weight of the engine, and generally of the entire power plant unit." He further stated, relative to the proposition that his engine mountings absorbed the forces developed in the operation of the engine, that he accomplished that object "by providing pivotally resilient mounting means *between the engine or power plant unit and its support";* that his power plant unit consisted of the "usual engine $1^a$ having the crank-shaft 7 connected with the fly-wheel $1^c$ and a fly-wheel casing $1^d$, and to which is fixed the transmission $1^e$"; and that the mountings were "adapted to carry substantially the *entire weight of the power plant unit* and are to be strong enough and reliable enough so that the power plant unit will be securely attached to the support at these two points in such a manner as to permit pivotal movement of the unit of an approximately orbital nature with respect to the support without any question arising as to the security and safety of the mounting." (Italics ours.)

In opposer's patent No. 1,890,871, issued December 13, 1932, relating to engine or power plant mountings for automotive vehicles, the patentee stated that the engine and the transmission formed a "unit power plant, the parts of which are fixed together for unitary movement with a housing $2a$ between the engine 1 and transmission 2 and enclosing the usual engine fly wheel $2b$." The patentee further stated: "The normal operation of the engine unit tends to oscillate the engine unit on its longitudinal axis in response to the impulses incident to the operation of the engine. *My mounting permits the engine unit to oscillate on said axis* but at the same time it allows the axis of oscillation to move relative to the vehicle or the frame and likewise move the engine unit." (Italics ours.)

Furthermore, it is clear from the record that appellant's engine mountings do not oscillate with the engine or power plant, but are so constructed that they, together with the method of mounting the power plant (hereinafter referred to), permit the "entire power plant to rock freely" on its "natural axis."

It is unnecessary to describe appellant's mountings upon which it uses its trademark, other than to say that they are substantially triangular in shape, and have substantially triangular interior openings, and that they are of metal construction, except for some resilient material at or near the top.

In his decision, as hereinbefore noted, the Commissioner of Patents stated that "if a power unit or source of power is mounted in resilient mountings of this character, and referred to as 'floating power,' the term is merely descriptive of the assemblage."

The commissioner further stated that the word "power," in the sense in which it

is used in the trade-mark "Floating Power," is the "equivalent of 'engine,'" and that the trade-mark would "indicate nothing more than a floating power unit."

Counsel for the opposer contends that the views expressed by the commissioner are in accordance with the facts and the law.

As contended by counsel for appellant, and as clearly appears from the affidavits of record and from the dictionary definitions of the word, "power" is an intangible thing. Generally speaking, it means: " * * * Ability, whether physical, mental, or moral, to act; the faculty of doing or performing something; capacity for action or performance or for receiving external action or force; capability of producing or undergoing an effect, whether physical, mental, or moral. * * *" (Webster's New International Dictionary.)

Mechanically, it is: " * * * The rate at which mechanical energy is exerted or mechanical work performed, as by an engine or other machine, or an animal. The units most commonly used are the *horse power* and the *watt*. The *power* of a direct electric current is the product of the voltage and current. The *true power* of an alternating current is the product of voltage, current, and power factor." (Webster's New International Dictionary.)

" * * * Any form of energy available for doing any kind of work; as, steam-*power;* water-*power;* specif., mechanical energy, as distinguished from work done by hand; as, a machine run by *power*. (2) Capability of performing mechanical work, as measured by the rate at which it is or can be done; capacity; as, the *power* of the engine ·was overstated." (Funk & Wagnalls New Standard Dictionary.)

Eminent authorities on the subject state in affidavits of record that the word "power" does not describe an engine, power plant, engine mountings, or any other part of an automobile, and that if it were used to describe any such parts, further explanation would be required in order that it might be understood what was meant.

An engine is " * * * a machine by which power is applied to the doing of work, particularly one that converts some motive energy, especially heat, into mechanical power." (Funk & Wagnalls New Standard Dictionary.)

From what has been said, it would seem to be clear that the term "power," as used in appellant's trade-mark, is not the equivalent of the terms "engine" or "power plant," nor is it, standing alone or in combination with the word "floating," descriptive of either. The terms "floating engine" and "floating power plant" are descriptive of certain physical units, and those units may be assembled or disassembled. That is not true of the term "floating power." As hereinbefore noted, "power" is an intangible thing, and merely combining the words "floating" and "power" does not make the combination tangible or descriptive of anything that is tangible. Furthermore, although the expressions "floating engine," "floating the engine," and "engine-floating elastic elements" were old at the time appellant adopted and first used its trade-mark, and started its extensive advertising campaign, in which, from July, 1931, to February, 1933, it expended the sum of $4,306,077, and in which advertising its mark "Floating Power" was prominently featured, we venture to say that no engineer or other person skilled in the art or otherwise would have known what was meant had it been suggested that "floating power" be assembled or disassembled, nor would it occur to any such person that an "engine" or a "power plant" should be torn down were it suggested that "floating power" be disassembled.

Is appellant's mark descriptive of engine mountings, or of any characteristic or quality possessed by them? We think the answer to that query must be in the negative. Engine mountings do not float. They are not "power." They do not even develop or transmit power, as do "engines." Furthermore, they, in and of themselves, are not responsible for that particular rocking feature of the "power plant," which might be characterized by the term "floating." That feature is brought about, in part, by the method employed in mounting the "power plant," which method consists of the use of two mountings only, instead of the three or four ordinarily used, and is known as a "two-point motor suspension." Accordingly, it is the method of mounting, together with the structure of the mountings used, which permits the "power plant to rock freely" on its "natural axis."

█ It is true that appellant's trade-mark is suggestive, but, in our opinion, nothing more, of one of the characteristics of appellant's power plants. Suggestiveness, however, is a permissible attribute of a technical trade-mark.

In the case of Van Camp Sea Food Co., (Inc.) v. Alexander B. Stewart Organizations, 50 F.(2d) 976, 979, 18 C.C.P.A. (Patents) 1415, where we had the trade-mark "Chicken of the Sea," for use on tuna fish, under consideration, we said:

"It is well settled in adjudicated cases that a valid trade-mark may be highly suggestive (in our opinion ofttimes the best ones are), without being offensively descriptive."

See Le Blume Import Co. v. Coty (C. C.A.) 293 F. 344, 351; Orange Crush Co. v. California Crushed Fruit Co., 54 App. D.C. 313, 297 F. 892; United Lace & Braid Mfg. Co. v. Barthels Mfg. Co. (D. C.) 221 F. 456.

█ We must hold, therefore, that, although appellant's trade-mark is *suggestive* of one of the characteristics of appellant's power plants, it does not *describe* its engines, power plants, or engine mountings, or any characteristic or quality possessed by them, but, on the contrary, is merely indicative of origin to the purchasing public, and serves to distinguish appellant's engine mountings from those manufactured or sold by others.

There is a suggestion in the brief of counsel for the opposer that at the time— March 31, 1932—the opposer or the Borg-Warner Corporation applied the mark "Floating Engine" to opposer's engine mountings, appellant had practically abandoned its trade-mark and did not use it for a period of a year, and that, for that reason if for no other, appellant is not entitled to have its mark registered.

It clearly appears from the record that merely through inadvertence appellant's mark was not applied to the engine mountings used in its automobiles of the so-called "P. B. model," produced in 1932. Appellant's chassis designing engineer stated that he had positive instructions from his superiors to apply the trade-mark to the engine mountings used in those models, and that failure to do so was due to a draftsman's error.

█ The testimony of record clearly negatives any intention on the part of appel-lant to abandon its trade-mark, and, in the absence of proof of such intention, the charge of abandonment cannot be sustained. See Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31, 21 S.Ct. 7, 45 L.Ed. 60; Blackwood Coal & Coke Co. v. Philadelphia & Reading Coal & Iron Co., 58 F.(2d) 440, 19 C.C.P.A.(Patents) 1227. Furthermore, the evidence clearly establishes that, although through inadvertence appellant's trade-mark was not applied to engine mountings used in automobiles of the "P. B. model," produced in 1932, it had been applied to engine mountings used in appellant's so-called "P. A. model" during the preceding year; that sales were made of several thousand cars of that model from January to October of the year 1932; and that during that year, sales having been made each month, 1306 engine mountings bearing the trade-mark "Floating Power" were sold as separate and independent commercial entities.

For the reasons herein stated, we are of opinion that appellant is entitled to have its mark registered.

The decision of the Commissioner of Patents is reversed.

Reversed.

GRAHAM, Presiding Judge (dissenting).

I have been unable to bring my mind to the point where I can agree with the conclusion reached by the majority in this case. I shall not attempt any lengthy discussion of the many points which have been incidentally brought up and discussed by counsel and by the majority, but shall state briefly my views on what I consider to be the principal point involved in the case, namely, whether the notation "floating power" is or is not descriptive, as here used. I am of opinion that it is descriptive, and ought not to be registered.

The term "floating," while usually applied to something which is sustained by and resting upon a fluid, applies equally, in my mind, to something which is movable. Webster's New International Dictionary gives several meanings to the word, as follows:

"Floating, p. a. 1. Buoyed upon or in a fluid; as the floating timbers of a wreck; floating motes in the air.

"2. Free or loose from the usual attachment; as, the floating ribs in man and some other animals.

"3. Shifting from place to place; having no permanent home; as, the floating population.

"4. Shifting or variable in its form, its incidence, or the subject matter to which it applies; hence, not fixed; not funded; not invested; not determined; as, floating capital. floating anchor. Naut.—Sea Anchor.—f. axle, Vehicles, a live axle for a self-propelled vehicle, in which the revolving part serves only to turn the wheels, the dead weight of the vehicle being carried on the ends of a fixed axle housing or casing. * * *"

We hear the expression used quite commonly in the ordinary language of the people, and as applied to the anatomy of man, such as "floating rib" or "floating kidney." When so used, it has always the meaning of something which is movable, and not fixed and attached in the ordinary way.

That it was well known in the automotive art is indicated by three patents which are incorporated into the record in connection with the letter of the Examiner of August 5, 1931, namely, Summers, No. 1,-701,396, Prosser, No. 1,761,584, and Lee, No. 1,729,394. In the Summers patent, which was issued February 5, 1929, before the appellant here began using the designation "floating power," the patentee spoke of "floating the engine" and described the manner of "floating." The patentee repeatedly, in his specification and in his claims, repeated this language as applied to an engine which was movable upon insulated mountings. The patentee Prosser likewise spoke of a "floating engine and associated hanger," and described his method of flotation. This patent was granted on June 3, 1930. The patentee Lee, in a patent granted September 24, 1929, described his engine as being "floatingly suspended," and as a "floating engine," and described means to "floatingly carry the engine weight."

In its common meaning, therefore, as well as in the technical language of the art in which the parties hereto were working, "floating" had a distinctive meaning as to the power plant of an automobile, and there could be no reason for misunderstanding on the part of one to whom the information was conveyed, that the power of an automobile was "floating."

A very involved and ingenious argument is made as to the meaning of the term "power"; that this designation "floating power" cannot be descriptive because it does not describe the device to which it is applied. Power, it is said, is an intangible thing, and is entirely distinct and separate from an engine or power plant, and that, therefore, these mountings upon which appellant's designation of "floating power" is placed, do not describe either the device or its functions. It is argued that the engine may create the power, but the power itself does not float.

I am unable to agree with this conclusion which seems to me entirely too technical, in view of the object which is sought to be attained by the Trade-Mark Act of 1905, as amended (15 U.S.C.A. § 81 et seq.). I cannot believe that any one would misunderstand what is meant by "floating power." Power, as I take it, is the energy which animates the vehicle, and includes in its meaning not only the actual automotive power, but the plant which creates it as well.

This conception is borne out by the same lexicographical authority above cited, Webster's New International Dictionary, as follows:

"Power * * * 11. Mech. a The rate at which mechanical energy is exerted or mechanical work performed, as by an engine or other machine, or an animal. The units most commonly used are the horse power and the watt. The power of a direct electric current is the product of the voltage and current. The true power of an alternating current is the product of voltage, current, and power factor. The apparent power (volt amperes) of an alternating current is the product of voltage and current. See ENERGY COMPONENT. b Capacity for operating; as, the power of an engine governor. c Applied force; as, the power applied at one end of a lever to overcome a "resistance" at the other end. d A source of useful mechanical energy; as, water power; hand power, etc. Specif., a mechanical source, as opposed to human power. e A mechanism by which energy is applied; as, a dog power; the mechanical powers. Obsoles."

The assistant commissioner makes a very pertinent observation which I quote:

"It seems obvious, if a power unit or source of power is mounted in resilient mountings of this character, and referred to as 'floating power', the term is merely descriptive of the assemblage. The term 'floating' when so applied is clearly and, as indicated by the patents or records, obvi-

ously descriptive. The addition thereto of the term 'power' does not save the notation and render it non-descriptive. 'Power' in this sense is the equivalent of 'engine' and the compound term 'floating power' would accordingly seem to indicate nothing more than a floating power unit. To concede that the applicant is entitled to the exclusive use of the words 'floating power' in describing a unit resiliently mounted would be to deprive other manufacturers of their natural right to the free and unrestrained use of descriptive terms, more specifically of their right to refer to such a unit as a 'floating power unit.'"

I agree with the suggestions made above.

There are several authorities which I deem in point, and which seem to point to a different conclusion than that arrived at by the majority herein:

In Chicago Pneumatic Tool Co. v. Black & Decker Mfg. Co., 39 F.(2d) 684, 687, 17 C.C.P.A.(Patents) 962, we were considering the trade-name "hicycle" used as a trade-mark for portable power tools, including electrical tools and devices. We held the mark should be canceled, and affirmed the decision of the Patent Office tribunals in that respect, holding the term to be descriptive, as used. In doing so, we made this pertinent observation:

"It seems to us that to hold with appellant in this case would require the application of a higher degree of technical refinement than we think the Trade-Mark Registration Act contemplates. We cannot doubt that whatever distinction those having highly specialized learning as to electrical technique might be able to draw by strict construction of electrical terms, the phrase 'High Cycle,' as applied to these motor-driven tools, does convey to the public generally a definite meaning distinctly descriptive of the tools. The relation between the cycle of the current and the revolution or operation of the tool or mechanism is too direct and immediate, in our view, to admit of any other conclusion. We think it is more than suggestive and amounts to descriptiveness."

In that case, it will be noted, the word "hicycle" or the words "high cycle" did not describe the tools, but rather described their method of operation. However, it

was such a description as was intelligible to and understood by those who heard it used, and the same is true of the expression here, "floating power." The hearer instinctively knows that the source of power, or engine, or power plant, is movable, and shifts, as the occasion requires.

Two decisions of the Commissioner of Patents are instructive and in point. One is in Ex parte Warner Gear Company, decided August 16, 1932, 156 Ms.Dec. 925, in which the term under consideration was the words "free wheeling," the assistant commissioner said:

"It seems to follow that if the applicant were given the right to the exclusive use of the term 'free wheeling' as a trademark for transmissions, the manufacturers of the transmissions disclosed in the above noted patents would be excluded from the right to use such term, or its equivalent in describing this characteristic of their respective devices. Nor would other manufacturers of free wheeling vehicles be entitled to use this term as descriptive thereof, without infringing the applicant's trade-mark."

Again, in Ex parte William Wesley Hicks, decided March 20, 1931, 156 Ms. Dec. 608, Assistant Commissioner Kinnan held the words "wired heat" as a trademark for electric heaters to be descriptive, and made the following statement:

"It may be said either of the two words of the notation used alone in connection with goods of the character here under consideration would, beyond any question, be merely descriptive. 'Heat' as applied to a heater is obviously descriptive and 'wired' as applied to an electric heater would as clearly be descriptive. It may be also noted that 'wire heat' would be merely descriptive because the heat is produced by the heating of the wire and so the wire gives off the heat and the heat would be correctly described as wire heat. No question could be raised as to the fact that the words 'wired heater' are merely descriptive. * * *"

I am of opinion that the decision of the Commissioner of Patents should be affirmed.

LENROOT, Associate Judge.
I concur in this dissent.